Okay, we'll call the next case of the morning, number 16-20691, Legacy Community Health Services v. Smith. Okay, we'll call the next case of the morning, number 16-20691, Legacy Community Health Services v. Smith. Ms. Smith. May it please the Court. Ms. Bennett, excuse me. Yes, Lisa Bennett, representing Charles Smith in his official capacity. The State's reimbursement procedures for FQHCs, like Legacy, do not violate the Medicaid Act. And the District Court's two injunctions relating to in- and out-of-network services are improper or at least severely overbroad. Now, there are a number of issues in this case, including threshold issues of standing and a private right of action. While I'd like to address all of those today, with the Court's permission, I'd like to begin with the out-of-network injunction, the reason being I would like to make sure it receives the emphasis it deserves as it's the element that really does the most damage. Well, actually, that's the easiest issue for your side, so why don't you go to standing? Sure. All right. I'm glad to hear that, so I'll begin with standing in that case. Legacy does not assert that it ever failed to receive its full rate in a timely fashion when providing the in-network services. And to the extent that the injury complained of is the cancellation of its contract with Texas Children's, that cannot be redressed by any injunction from this Court. The District Court's injunction has not and could not order Texas Children's to resume contracting with Legacy. And furthermore, the State's regulations in that area do not, or the State's rules in that area do not create an absolute barrier to such a contract. In fact, 17 other FQHCs or more, I believe there are more since the record was established in this case, remain contracted with Texas Children's. And with respect to the out-of-network claims, Legacy presented no evidence that it had submitted claims for subsection 7 services, which was originally the thrust of its complaint was that it had provided subsection 7 services, but that was different than emergency services. Out-of-network services? Correct. They were not? Okay. But they would have standing as to that, wouldn't they? So for the out-of-network services, on the theory that the District Court ended up with, which is this theory that it doesn't matter if these out-of-network services are subsection 7 or not, the State always has to provide a reimbursement. Under that theory, the State wouldn't really contest the standing because it can be redressed and is being by additional payments. But on the theory that was originally put forward in the complaint and the briefing before the District Court, they were really arguing that these were subsection 7 services, but nevertheless weren't being addressed by the State. You contend that they're – well, but that's not the way the District Court saw it either, though. The District Court, I would argue, ultimately rendered judgment on grounds that were much broader than what Legacy was originally asking for. Well, I mean, we can – that doesn't mean they don't have standing here. Right. So ultimately, the way it ended up on the out-of-network claims, I don't want to contest that there would be standing on that. Okay. All right. So that's your basic argument about standing? Correct. Okay. And if the Court doesn't have further questions on standing, I'll go ahead and go in order and turn to the Section 1983 private right of action. And this is an issue of first impression for this court, which is operating on the background of several out-of-circuit decisions, finding a right to full payment under the provision asserted here. But no other court has found an unambiguously conferred right, as Gonzaga requires, to a certain payment procedure or a certain incentive structure. And since the out-of-circuit cases were decided, the Supreme Court plurality in Armstrong wrote to express a doubt as to whether providers are intended beneficiaries of the Medicaid Act at all. And the circumstance that the Court was looking at there was the state plan must provide payments sufficient to enlist providers so that care and services are available. That's exactly the kind of incentives question that ultimately Legacy's case is relying on here as opposed to the plain text. But you're making a pretty fine distinction. In other words, you've got five circuits that have said there's a private cause of action to enforce 1396ABB. So, I mean, exactly what the scope of that cause of action is is something to be decided once they get into court under 1983. I don't quite understand how that deprives them of a cause of action, generally speaking. There's some overlap, to be sure, on that issue, and the state acknowledges the tension that exists with the out-of-circuit cases. However, based on Gonzaga, which is the most recent Supreme Court opinion on this, I mean, the 1983 cause of action is being construed very narrowly by the Supreme Court under its current jurisprudence. And since those out-of-circuit cases were decided, the indication from Armstrong is that we should construe it even more narrowly when we're looking at providers. So the state acknowledges that that is a fine distinction that's being made, but in light of the recent case law and the narrowness of the unambiguous right that must be conferred, that has to be the right that the plaintiff is actually asserting in the case. And here they're not asserting their right to full payment of a PPS rate. They've gotten that for all the in-network services. They are asserting a right to be paid in a certain way and for the state to maintain certain incentive structures, which is different. I'm sorry, I forgot. Did the state apply this rule about having the managed care providers? I assume the state has more than one managed care provider. That's right. Legacy is still contracted with four others in the Houston area. Yes. Well, I'm not talking about the Houston area. I'm talking about statewide has delegated this job to the MCOs. Okay. And the state placed the same condition on all the MCOs at the same time, or did it just do it in Houston or just with respect to Legacy? This is all at the same time, and it was done as part of the uniform managed care contract. So the state's position ‑‑ So it's a statewide modification. It's a statewide modification that applies to all MCOs. And Legacy is the only community health place that's sued. Is that right? Yes, that's right. And to my knowledge, they're the only ‑‑ the record at least does not show any other FQHC that has been dropped from a contract. So this was implemented statewide through the contract system because of the state's position that subsection BB5 does allow the state to do this. And basically there are a number of conditions of managed care that are managed through those uniform contracts, and then in turn the MCO would need to go to all the FQHCs it contracts with and change those contracts, which it did, and Legacy signed on to that new contract. I'll turn next to the in‑network claims, if there are no further questions on Section 1983. Texas's in‑network reimbursement procedure, eliminating the need for wraparound payments, does not violate Section 1396A BB5 for three reasons. First, the plain text of BB5 and its companion provision, 1396B M2A9, do not prohibit this approach. And I apologize for all the long numbers in these sites. Second, the CMS guidance letters that Legacy relies on acknowledge that the act is silent on this point and they are not entitled to Chevron deference. And third, Legacy offers only policy reasons why Texas's system violates the Medicaid Act, but the statute does not address these concerns. And in practice, Legacy has not presented any evidence of a systemic problem with FQHC contracting. So starting with the first of those, the plain text, that's where the court should begin and end its inquiry if the text is clear. So long as FQHCs receive their full PPS rate, subsection BB5 is satisfied. Shaw, New Jersey Primary Care, and three lower counties, the cases that were primarily relied on by the district court in Legacy's briefing, all identified situations of nonpayment. In Shaw, supplemental claims wouldn't be billed unless an MCO had paid, not whether there had been a determination. Primary Care, the state said it could only be a supplemental payment if there had been a payment in the first place, so they had no obligation to insure payment. And three lower counties. Well, why did the district court feel it necessary to enjoin the state of Texas to provide the backstop payment? Well, that would be a very narrow injunction. Well, are you saying that's superfluous, that Texas was, in fact, adhering to that responsibility? Texas has always acknowledged that it has that responsibility, and, in fact, when this suit was initiated, that language was in the state plan. That state plan was amended in 2016 after the filing of the suit. That was 1602. 1602, right. So the one that was in place at the time that the suit was initiated did have that language in it, and the state didn't believe the revision to take away any obligation to backstop. It simply made it to where it wasn't going to come. Well, that's after legacy had already been terminated, though, right? That's right. So, okay. Right. So, anyway, so the Texas law does not, the one that was in effect does not suffer from the defect that Texas was trying to pay less than it's obliged to under federal law. That's right. And if the court is looking at SPA 1602, the new one, I mean, the state concedes that that language is not in there, and if that is the problem, the legal defect that this court ultimately identifies, a very narrow injunction that simply required the language that was in the previous SPA on backstopping to be put into the new SPA, it really wouldn't affect the state's overall payment system or obligations, and that would be a much narrower injunction than what the district court issued, which was to say that wraparound payments must always be given and the state can never impose a ceiling or the state can never ask for more than the floor. I need to take you back on, well, never mind. It will come up later. Sure. Turning to the second provision that dovetails with BB 5, 1396 BM 2A9, it's a little subpart nine. That provision is satisfied so long as MCOs pay FQHCs at least the market rate, and only one other court has looked at this squarely, and that's the three lower counties court, and there the Fourth Circuit expressly held that that provision says nothing about a ceiling or a precise congruency, and in fact, in that case, the FQHC was alleging that a minimum state rate that was higher than that floor was in place, and as a result, UnitedHealthcare, an MCO, wouldn't contract with it, and the Fourth Circuit said, well, this may be true. Subsection nine does not address three lower counties' concern, and that's the same here. We have to look at the statutory text. It provides a floor. It says nothing about a ceiling or a precise congruency. So the second point I'll just briefly restate is that the CMS guidance letters that Legacy is relying on, these are letters to state Medicaid directors. They're not entitled to Chevron deference, and they furthermore acknowledge the textual silence of there being anything that would require what Legacy is asking for. And third, turning to the policy reasons, since Legacy is only offering policy reasons, it is appropriate to look at these incentives as they've played out on the ground, and as the Honorable Judge Jones pointed out already, this has not been demonstrated to be a systemic problem for FQHCs. Legacy chose to expand in a certain way, take over existing practices. This resulted in a very rapid expansion. Texas Children's decided to terminate that contract. Both of them are private parties who are free to make their own business decisions, and that's what happened here. Does the state know anything about Legacy as a business entity? I don't want to waste my time asking you questions. Not in particular. I mean, I think basically what Legacy has done is they've partnered with existing Medicaid providers. So basically there's already a Medicaid provider in a community. Legacy comes and affiliates with that office, turns it into an FQHC, so overnight you go from a Medicaid provider that's operating in the usual managed care framework to being an FQHC without there actually being an expansion of services. What's the difference? Well, the difference is that the terms of reimbursement for FQHCs ultimately are much more favorable. Well, why are they more favorable? That would be because of the full people. Because of the requirement to pay the full PPS rate. So the incentive that Legacy is. And why did the government create that distinction? There's been a lot of acknowledgment over time that there is a tension between the FQHC model and the FQHC system, but basically it was targeted at expanding access in underserved communities. So the same way you have food deserts without grocery stores, you've got areas that don't have any clinics. And so it was to incentivize clinics going into new areas, providing service to people who didn't have it before. And Texas Children's, based on their affidavits, they decided that wasn't what Legacy was doing. And the state isn't saying this is illegal, what they were doing, but Legacy. Well, it seems to me that that would be a question of fact, right? At best it would be a question of fact. Their motivation. But I was just trying to – none of this made any sense in terms of economics to me. I think that's a fair point when it comes to various provisions of Medicaid. Okay. We have your argument. You have time for rebuttal. All right, Mr. Waters. Thank you, Your Honor. To clear up a few things that we just heard, Your Honor, the focus here on just Medicaid is not the focus that Congress was interested in when it created these payment rates. And that, you know, is at the heart of all these cases, numerous cases in the courts of appeals, all of which, as Judge Smith just mentioned, found that there's a private right of action because these are specific rights-granting payment requirements to coordinate two major federal programs. And that seems to be lost in the last discussion here, which is – and it gets to really fundamental issues of appropriation law. Well, let's – before we start going to fundamental issues like that, let's start with the even more fundamental question of standing because I do not understand your theory of standing here. Well, when you have an entity that is in a highly regulated system like this, as specifically mentioned in the statute in countless places in the Medicaid Act, that has to operate within this Medicaid system, again, creating that private right, but it also creates standing. Well, you have to have injury. What's your injury? The injury is – the injury, Your Honor, is creating a system that Congress didn't want. No. Now, wait a minute. The injury has to be injury to you. Yes. And if you look at the 1998 interpretive material, which is binding on the State of Texas, by the way, as a condition of its grant, but if you look at that interpretive material, it says that you are supposed to only not get involved – really, you, the State, are supposed to not get involved in these payment provisions. I still don't understand what your injury is. If you were paid what you were supposed to be paid, your injury has got to be that your contract was terminated. Is that right? The contract was terminated for the very reasons that were predicted, if you will, in 1998 by the expert federal agency. That happened in the TCH, this Texas Children's Health Plan, but there's nothing to stop that injury from happening again. I still don't understand, but injury has to be injury to you, and injury to you is that the contract – it's not that you weren't paid. It's only – and I'm not talking about out of network at this moment. I'm only talking about the contract with the MCO, and viewed in that way, wouldn't you have to – how can that injury be redressed? In other words, even if you were to win on some sort of declaratory judgment or the injunction that the court has granted, without getting your contract back, what good does that do legacy? This – the contract is the immediate action that happened because the system was unlawful, and it is going to happen again and again. So are you going to put them in jail? What are you going to do? I mean, what does legacy –  should implement a lawful Medicaid program? Well, why didn't you file a class action if this is some kind of systemic failure on the part of the state? I mean, why didn't – why wouldn't all of the FQHCs have had the same type of complaint that you do? Your Honor, any one of the FQHCs has the right to bring an action to enforce federal law in this system that is unlawful, and it doesn't need to be a class action with due respect. Did – was there ever a wraparound payment that was due to your client that was not paid? There was no wraparound payment, Your Honor. Was there any ever due that was not paid? I mean, you got paid what you were entitled to, and there was no need for a wraparound, but there was no wraparound payment that you thought you were due that did not get paid. Is that right? Your Honor, the system is not supposed to – and the explicit language of federal law is the state is to make these payments and not to create the disincentive that resulted in the very harm that we're talking about, the Texas Children's Health Plan terminating not, and with due respect to opposing counsel to say that Legacy is some sort of fly-by-night organization that's making up these rules is, frankly, an outrageous statement. I didn't read their brief that way. I read their brief as saying that Legacy was by far the most costly provider and that there are extrinsic circumstances, but those are – and that was the reason it was terminated, but that's – just like what you're saying just now raises questions of fact. We're not on those. We're dealing with the law of redressability. Yes, Your Honor, and saying Legacy is by far the most costly, just to clear up a few things, that rate is set by the state of Texas, not by Legacy. Well, actually, it's set on the basis of a federal formula, right? Correct. And that, again, gets to the point of these statutes is to integrate the two programs together. And when – It's still 50% higher than according to the state, but that's not here nor there. Get me back to redressability. How does the district court's decision in this case grant any relief to Legacy? Granting relief to require the state to implement a lawful system so that Legacy, which has to operate within that system, and I think that's also important, Your Honor, to point out that under the terms of the Section 330 grant that creates federally qualified health centers, they have to contract with the Medicaid program for all intents and purposes. Well, so what you're saying is that Legacy is now frozen out of the market. It cannot be an FQHC because of this allegedly illegal payment system? Your Honor, the system – You're not saying that, right? You're still an FQHC, right? Putting aside all the damage that was done on the outer network issue, the system is supposed to be designed, and that's what the specific federal law says, is the system is to be designed to allow FQHCs to operate seamlessly when a state elects to have a managed care program. Well, so is Legacy frozen? So you're saying Legacy is no longer functioning through an MCO? Legacy right now has contracts with other MCOs, but that's not the point. The point is to create the federal law. But all those other MCOs are working under the strictures of the allegedly illegal payment system. Is that right? For the time being, yes. I see. Okay. Well, Your Honor, the situation that occurred here was described in great detail in the state Medicaid director letters from 1998, predicted with 100 percent accuracy about what happened here, and the interpretation of the expert federal agency was that federal law was designed not to create this disincentive to use a FQHC like Legacy. The point was that these managed care plans would negotiate independently of the state or not being told what to pay by the state, they would negotiate with providers. Well, I mean, you are conflating. I suppose that happens sometimes. You're standing with the statute itself. But the bottom line, it seems to me, is still we will agree to disagree. I do not see the redressability here from the injunction that the district court has ordered. The redressability, Your Honor, is to operate in a system that doesn't create disincentives to use an FQHC like Legacy. That's the redressability. And if the state of Texas had implemented their Medicaid program as intended, then the harm would be redressed, which is to operate in a system that doesn't have the disincentives. And I believe this Court and the Supreme Court have said that the threats of termination, the operate in a system that doesn't have the disincentives. Since you never lost a dime out of this, wouldn't your burden of proof ultimately have to be that the MCO was not, like the Shaw case, was not paying you what you were owed? Your Honor, I think Legacy has certainly lost a lot of money as the result of the upset created by this termination. Well, because you're out of network and you continue to service these people, and that's separate problems.  Well, I still believe, and I guess we will agree to disagree, that being forced to operate in a system that was specifically designed, and I think it does get back to the 1983 issues, you have statutory requirements that are specifically designed to ensure that this situation doesn't happen and that you have a termination like this. And their own, the government, the state's brief points out, oh, this high rate. The high rate is the very reason why Congress separated these two payments. And I will say, Your Honor, if the state wanted to do what they're doing, there's a very clear statutory option, which is under BB6. And the interpretive material, again, another state health official letter from April of 2016, in the middle of this case, where the expert federal agency said, if you want to do what Texas is doing, you can do that. The statute allows it. You have to do it under BB6. The statute, the baseline of the statute, the default, is under BB5 and then tied to this Clause 9. Well, the strange thing about that statement of interest, it seems to me, is that it was filed after the district court had already made its decision on the BB5. I'm not talking about the statement of interest, Your Honor. I'm talking about the April of 2016 state health official letter. Okay. Where, again, CMS, the expert federal agency, has said you aren't supposed to do this. So I think the statute is clear. What you have is this Clause 9, this pay no less than, is not an invitation, I don't believe, if you look at the statute and the statutory structure. And it's a very carefully designed statutory structure where Clause 9 is recognizing the fact, as described in the district court's decision, as described in all these court of appeals decisions, that with managed care, what a state is doing is hiring an outside vendor to manage its program, to negotiate with health care providers to get the best rates and to get the best services. So that is, as Judge Jones, you mentioned earlier, you've delegated to these MCOs running your Medicaid program. And what Congress said is we want to allow states to do that, but we're going to have rules about that. And this Clause 9 would make no sense unless it was anticipated in a situation where the state was not setting rates, but where there was a competitive marketplace. And so the state and the federal government were out of those rate-setting situations. Clause 9 is merely a protection because it is tied, as the legislative history, the public law that created Clause 9 and BB-5 said they're conforming amendments. They're two sides of the same coin. And BB-5 says we're going to have this two-payment system. The state of Texas absolutely, with due respect, we still have this payment by the state. That's just not true. It was taken out of the state plan. There is no payment by the state. There's a blatant and clear violation of the statute right there. But beyond that, the provisions of the statute that create this system are not being complied with. And all the district court said is go back and do it right. Aren't you basically just arguing purposively about what you think the statute ought to say? Because all it says is the state shall provide for payment. It doesn't say by whom. For payment to the center of a supplemental payment equal to the amount, if any, by which the amount determined under paragraphs 2, 3, and 4 exceeds the payments under the contract. It says the payment by the state first in BB-5. No, it says shall provide for payment. The state plan shall provide for payment, and it says by the state, but provide for payment of a supplemental payment. It's only a supplement. That's right. But it doesn't say that the state can provide for supplemental payment by going through the MCO. I think we're in agreement, Your Honor. The MCO is not to make this supplemental payment. The state is to make the supplemental payment. And I think if you look at why did Congress make this carefully constructed statutory scheme, there is three different relationships that are clearly laid out in federal law. One is between the MCO and the health center. The other is the health center and the state, and the other is the MCO and the state. And each of these provisions work together in unison because there is a recognition that the MCOs are getting a capitated payment, are at liberty, the whole point of that is they are at risk, and they are at liberty to negotiate the best payment rates they can with these providers, including FQHCs. Is there anything specifically in the statute that prohibits the state from requiring the MCOs to pay the full price? Yes, Your Honor. I think if you look at the statute, the way the statute was constructed, why did Congress set up this Clause 9? Because it's a recognition that the MCO and the providers, including the health centers, are negotiating over here at arm's length. The only reason you have that Clause 9, if the state was correct, there would be no reason for Clause 9. If it was basically the state can regulate the rates however they want, then you wouldn't need a Clause 9 as a backstop. Clause 9 is there because it ties right to BB-5, and BB-5 says, and again, it is not in the statute, but it was interpreted by the expert agency at the time, and the Supreme Court has recognized numerous times, that expert agency interpretations at the time, 1998, are entitled to greater respect. But you have these two provisions tied together because it's all of a recognition that the MCO and the providers are negotiating rates. And so how are you going to, in that situation, Congress wanted to allow states to allow this to happen, to use MCOs as a tool, how are you going to avoid the subsidy issue that Congress explicitly, and courts have reinforced over and over again, that they're these special rates because, again, you're coordinating two programs. Why isn't there any kind of administrative action that Legacy could have taken at the time that it was terminated, or before it was terminated? First, I don't believe so, but secondly, under a 1983 case, we don't have to follow state administrative process. No, I don't mean state, I mean federal, through the CMS. No. It's not? Well, the state of Texas is the single state agency, and they're the ones responsible for Medicaid in Texas. Well, I understand that, but we just had a case called PPGC versus G, where I thought that that was where a provider was being terminated by the state of Louisiana, and had one of the arguments in the case was that that provider had not exhausted its remedies within the Medicare or Medicaid program. I think this court found for PPG. I understand that, but it was specifically because the court held that the patient had a right to bring suit, and the court didn't really solve the question about the fact that the provider had a — I'm just asking you because I — The PPG case, I think, is spot on in several respects. That had to do with what's called the freedom of choice provision for the patients, as opposed to — but this is of the same ilk that you have a specific rights-granting language for these unique things called FQHCs, and it is in federal law that they will be paid not only in this manner, but in this way. And if the states don't want to do that — Are you saying affirmatively that there is no internal administrative procedure through Medicare, through HHS, that legacy could have availed itself of, or are you saying you don't know? I think I know, and the answer is no, there's no affirmative. Okay. And if the court's referring to the Armstrong case, I think the Armstrong case exactly proves what we're saying. Armstrong was a case under what's called A38, which is the provision of the Medicaid statute that has very broad requirement that states for efficiency and economy set payment rates for anybody. And what the Supreme Court said in that decision is really a reinforcement of Gonzaga and Blessing. And again, for our specific FQHCs, five other courts of appeals have said very clearly that these statutory provisions are rights-granting provisions. If there are rights-granting provisions, you can proceed under 1983. If not, then Your Honor's correct that you would go what Justice Scalia said in that case was to go to CMS. I'll give you a couple of extra minutes if you'd like to get to anything else in your argument. Well, Your Honor, I'm a little concerned on the outer network issue. So that seems to be the one issue that's very clear and straightforward, which is that in the absence of a contract which funnels you into BB-5, you have these specific payment requirements, and that's exactly what's happening. Did you make any proof? So what is the value of the emergency services clause? The value of the emergency services clause is, well — Didn't the Court basically erase the distinction between out-of-network and emergency services? Well, I think, Your Honor, what the Court is saying is that the specific governs over the general. You have general provisions on managed care, general provisions on emergency services, general provisions on unforeseen, and so on and so forth. There is a specific payment requirement, and it does get to appropriations law, Your Honor, which is Congress is making sure that the appropriation for 330 goes to 330. So why is there an emergency services provision if you're — I mean, you are required to pay more for emergency services, but why should you worry about being an MCO at all if everything is required to be paid according to your PPS? Your Honor, the — at the heart of our contention is — I mean, answer my question. I'd like to, Your Honor. Okay. Which is that states have delegated, as you pointed out early on, all these requirements to these MCOs. What I think very clearly Congress has done is say for this one very limited exception, this one very limited group of providers, this very small group, these federally qualified health centers, we're going to claw back some requirements. That's why BB-5, for example, says there will be this supplemental payment by the state to say that these FQHCs are just like the hospital down the street or another provider group is just not correct because, again, you have two major federal programs that Congress has integrated together by — through these various statutory provisions. So basically — And that is — So basically it doesn't matter whether you work through — I don't understand. I just don't understand. If everything that you do for patients is compensable at a PPS rate, whether or not you're in an MCO, then why does it matter whether you're in an MCO? Why does it matter if you're in an MCO? Right. One of these federally qualified health centers? Well, because there's a few reasons. It's really outside the record, but the health centers want to work with the MCOs because of quality of care. And there are various programs that MCOs implement and that have incentive payments, for example, that if — which is early periodic screen diagnosis and treatment for children. And there are extensive requirements for documentation that you see children on a regular schedule, and MCOs are held to that standard. If the health center helps them meet those standards, then they get additional payments. So it is better to work within the system than be outside the system. But I would say, Your Honor, that the Second Circuit — in the New Jersey primary care case, by New York in the Shaw case, and both courts said, you know, who's in the best position to design a compliant system and address these issues? It's the state. These are small providers. Legacy is a very large provider and a very important part of the safety net in Houston, which is why, again, I take great offense at some of these statements about Legacy. But they are not the state of Texas. The state of Texas is running a $40 billion Medicaid program, and they're in the position to design a program that is compliant with the law. I have one other question, and that is you said that this 1998 guidance is part of the contract that Texas has. Yes. Which makes it binding, irrespective of, you know, that it's not a regulation. What's your citation for that? I would say — In your brief? Well, it really, in response to the reply written in the state's position, that these state Medicaid director letters don't apply to it. And perhaps this is an area that, if this was the only thing going, we couldn't enforce that, because, again, we have to enforce rights per the statute under 1983. But the 1115 waiver, which is page 123 of the Record of Appeal, if you look at Special Terms and Conditions, which I'm not sure it's about 30 pages long, but Special Terms and Conditions 2 through 4, 2, 3, and 4, say specifically that the state, in accepting this waiver, is agreeing to be bound by these state Medicaid director letters. And then in the state plan itself, and I could get you the citation, all states also agree to that. That's kind of a standard federal grant condition that it isn't the interpretations of the law. And that, again, goes back to, frankly, Supreme Court cases, Bennett v. Kentucky, which is, I believe, a 1985 decision. Okay. Ms. Bennett? I'd like to make two points. One deals with the in-network issue, and then the other deals with the out-of-network issue. So with respect to in-network, I just want to be clear that we need to distinguish what the statute permits the state to do in terms of the flexibility it's given, which, undeniably, it allows states to set up a system where MCOs would negotiate a rate that's less, and the state provides a wraparound payment. That's permitted to the states. But nothing in the text prohibits what Texas is doing. And ultimately, as this Court has held in the Louisiana case, the state has flexibility to administer its Medicaid program, except to the extent it runs afoul of the Medicaid Act. There's just nothing in this text that it's running afoul of. Has the state bound itself to the 1998 guidances? Well, the state's arguments haven't pertained to the Section 1115 waiver, but the federal agency has kind of been back and forth with the state on this, because don't forget that this has been in place since 2011, even though the SPA wasn't approved until 2016. Since 2011, Texas has been submitting, every year, actuarial data, the contract with MCOs. CMS has had this information since 2011 and always approved those. It wasn't the question I asked, the fact that they acquiesced. Is the state violating conditions to which it agreed pursuant to this 1998 guidance? The guidance says that the specific approach that has been proposed by several states involves payments of a capitation payment that includes the state's best estimate of 100% of the reasonable cost. In return, the MCOs are required to make payments to FQHCs. While HCFA understands the reasons for this approach, our view is that such reimbursement approaches are not consistent with the BVA and therefore violate the policy guidance. That position certainly does stake out that position of CMS. That's the 1998, but you addressed it briefly in your brief, I thought. Apologies, I don't recall the addressing of that in the brief. Well, in your brief, you said that it was only a policy guidance and that it was entitled to no more than hour deference and it was inconsistent with the flexibility of the statute. That's right. All that is true. I'm just wondering, even if that's true, can the state bind itself to something that's narrower than or less flexible than the statute, and did the state do so? That's an issue that was not briefed before the court, so I would need to potentially submit supplemental briefing on that issue. Well, you can submit whatever you want. To me, the question, at least the question I'm hearing is, I thought Mr. Waters gave a pretty impressive substantiation of the fact that that letter is incorporated specifically in writing in what the state agreed to. So, I mean, address that narrow question. Did the state commit itself to abide by that medical director's letter? If that is true, which I don't believe it was briefed, so I would need to look at that language. If they did, I would still argue that the nature of the understanding between CMS and HHSC had changed over time, certainly by the time the state plan amendment was done in State Plan Amendment 1602, which CMS has said is not in conflict with its prior guidance. That was, of course, based on its position that BB-6 is the proper avenue. Do you agree that there is no possible internal remedy for legacy through HHS? I believe that is correct, although it also was not briefed. Okay. With the court's permission, I'd like to very briefly just note that the out-of-network claim does provide a perfect starting point for discussing the issue of the Section 330 funds and the overlap of these two programs. Basically, under Medicaid, the service provided still has to be a covered service, and that was acknowledged by other courts, Shaw, New Jersey Primary Care, et cetera. Here, the Subsection 7 services are those covered services. When it comes to out-of-network, non-preauthorized services being provided, that is not what we had here. It looks like I'm out of time, unless the court has further questions. I guess we don't. Thank you. Very complex case. Thank you very much. We'll be in recess.